**SO ORDERED.**

**SIGNED this 10th day of March, 2020.**



_____
Robert E. Nugent
United States Bankruptcy Judge
_____

DESIGNATED FOR ONLINE PUBLICATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

IN RE:

PIXIUS COMMUNICATIONS, LLC,

Debtor.

Case No. 19-11749
Chapter 11

## ORDER REGARDING DEBTOR'S NOTICE OF AUCTION RESULTS (Doc. 228); DEBTOR'S FURTHER SUBMISSIONS (Doc. 252); and SUBMISSION OF REJECTION BID (Doc. 256)

Maintaining a level playing field for bankruptcy sale bidders fosters a transparent auction process that insures the appearance of integrity and trustworthiness of the bankruptcy court system. Applying and enforcing previously-approved bid procedures serves that object. In this case, detailed bid procedures were negotiated among the debtor-in-possession, the unsecured creditors'

1

committee, and a secured creditor and were approved by the Court. An auction based on those instructions ensued. Now that two bids have been obtained via that process and the auction closed, a rump group of three of the members of the debtor LLC, who are also secured creditors, asks the debtor to "reject" the current bids so that they can make a partial credit bid under 11 U.S.C. § 363(k) and a partial cash bid in an effort to outbid the actual participants in the auction. At a hearing held on March 6, 2020, the Court directed that the Members' Bid be put in writing, along with an executed proposed Asset Purchase Agreement, and filed not later than the close of business on March 9, 2020. Those documents were timely filed.

Having now reviewed the bids while applying the previously-approved bid procedures, I conclude that the consideration of the Members' Bid, even to the extent it is a credit bid, violates those procedures and would be improper. After reviewing the auction bids, the LTD bid provides the highest yield in cash to the bankruptcy estate. Despite the debtor's, the member group's, and JMZ's suggestion that the JMZ bid or Members' Bid would result in the retention of all of the employees, neither bidder has committed to that in writing. The Members' Bid does not comply with the Bid Procedures and cannot be considered. LTD's bid is the Higher or Otherwise Best Bid. The debtor is ORDERED to close the sale of its assets to LTD.

Factual Background

2

Bid Procedures were approved in this case on December 4, 2019 for sale of substantially all of debtor's assets pursuant to 11 U.S.C. § 363(f).[1] The current matter relates only to the sale and bids for debtor's personal property—primarily equipment, eight (8) owned towers, customer contracts, and FCC licenses, with executory contracts and unexpired leases to be assumed and assigned.[2] They provided for an orderly process that required potential bidders to submit their Potential Bid Documents by December 23, 2019 to gain access to the Data Room, and their bids to be submitted by January 6, 2020.[3] If an auction became necessary, it was to be conducted January 13, 2020.[4] The bid submission deadline and auction date were extended one week to January 13 and January 20, respectively.[5] The auction date was further extended to and conducted on February 7.[6] Several bidders qualified and bid by the initial deadline, but only two participated in the auction: LTD Broadband, LLC and JMZ Corporation. There is no contention that any secured creditor sought to qualify as a potential or actual bidder. Nor did any secured creditor participate in the auction itself. Both the court's order and the procedures it approved provided that cause existed to limit certain credit bids under § 363(k), stating that creditors holding claims secured by equipment did not yet

---

[1] Doc. 150, Order, pp. 1-5 and Ex. A - Bid Procedures. pp. 6-16 ("Bid Proc.").
[2] Docs. 151, 162, 170.
[3] Doc. 150, ¶s 9, 13 and Bid Proc., pp. 7-8, ¶s 1, 2.
[4] Doc. 150 at ¶ 14 and Bid Proc., pp. 9-10, ¶3.
[5] Doc. 195.
[6] Doc. 213.

3

hold "allowed secured claims" because their collateral had not yet been valued and because piece meal credit bidding would chill the bidding process.[7]

The debtor is a Kansas limited liability company with numerous members.[8] Four of those members serve on the "board of members" and the company's business is managed by a non-member manager as Kansas law allows. The fifth member, Jay Maxwell, is no longer on the board and there is a contentious dispute between him and the other four members. Before this case was filed, all five members acquired the company's secured debt to CrossFirst Bank. Each member claims to be owed some portion of that debt, which is secured by all of the assets of the debtor, and which totals approximately $4,338,984.50. According to the schedules, the assigned CrossFirst debt is secured by all of the debtor's assets.[9] Three of the four remaining board members, Messrs. Hanson, Vosburgh, and Lies (the "Member Group"), have joined to formulate the Members' Bid, discussed below, that was proffered orally to the court at the March 6 hearing and documented in the March 9 submission.

The Court approved Bid Procedures after several hearings. The board of members, Maxwell, and the committee negotiated the terms of the procedures.[10] Paragraph 3(a) of the Bid Procedures required that if two or more bids were received, the Seller, defined as the debtor and the Committee, would conduct an

---

[7] Doc. 150 at ¶ 16 and Bid Proc., p. 11, ¶3(c).
[8] See Doc. 88. Many of the debtor's members hold very small percentage interests. It is fair to say that the principal members are the rejecting bidders, Ms. Murray's trust, and Mr. Maxwell.
[9] Doc. 86, p. 17.
[10] Doc. 150.

4

auction.[11] Only bidders who had supplied the Required Bid Documents would be permitted to attend the auction. Bidding would begin with the Starting Bid being the highest or otherwise best offer, followed by rounds of subsequent bidding with the high bid in each round being announced by the Seller. No secured creditor with a lien on equipment was permitted to credit bid. Each bidder had the opportunity to submit a bid "with full knowledge and confirmation of the Leading Bids."[12] The Seller was to maintain a transcript of the auction.[13] None has been provided to the Court. At the close of the bidding, the Seller could review and evaluate each bid on the basis of financial and contractual terms and other relevant factors. Prior to adjourning the auction, the Seller was to identify the Successful Bid and next highest bid, called the Alternate Bid.[14] The Seller was to then file a motion within five business days of the auction for the Court's approval of the Successful Bid.[15] The Seller failed to follow these last two steps of the auction procedures.

At a hearing on February 26, 2020, the debtor announced that the auction had been conducted on February 7 and that two bids had been received, one from LTD and the other from JMZ (no mention at that time of any "credit bid"). LTD's bid was for $4.1 million and JMZ's for $4.075 million. LTD agreed to acquire only some of the debtor's lease obligations while JMZ offered to acquire all of them. At

---

[11] The Bid Proc. at p. 6 state the "Seller" for purposes of the Bid Procedures will be the Debtor and the Committee, and "will jointly hold and exercise any rights and discretion granted the "Seller" in the Bid Procedures." The Court will resolve any disputes between the Debtor and the Committee.
[12] Bid Proc., pp. 10-11, ¶ 3(b).
[13] Bid Proc., p. 11, ¶3(b).
[14] Bid Proc., p. 11, ¶4(a)
[15] Bid Proc., p. 12, ¶4(a).

5

the February 26 hearing, debtor's counsel made no recommendation concerning which was the Successful Bid, noting that the assumption of various leases had economic implications for the estate that made it difficult to weigh the two bids side by side. Because some members of the Committee are lessors under leases that might be rejected to their detriment, the Committee essentially "recused" on the issue of which was the better bid, and simply urged the court to make a prompt decision. All parties agree that the estate is insolvent, and the unsecured creditors are out of the money, at least from the proceeds of this sale.

The Court directed the debtor to return to court on March 6 with an analysis of the outcomes under each bid and a suggestion or recommendation about which bid to accept. In response, the debtor filed "Further Submissions"[16] late on March 5 that analyzed the economics of both bids, proposed that they both be rejected, and urged acceptance of a bid made by the Member Group composed of their credit bid of $2.7 million for the Wichita market area of the business and the acceptance of JMZ's cash bid of $1.5 million for the Kansas City and Joplin market areas (referred to in court as the "rejection bid" and here as the "Members' Bid"). Not surprisingly, the two auction bidders and the Committee cried foul. At the hearing, the debtor proposed that the Member Group would supply the $1.5 million for Kansas City and Joplin if JMZ did not wish to close. The debtor and the Committee also asserted that LTD had colluded with a third qualifying bidder, WISPer ISP, by agreeing to sell one of the markets to WISPer ISP if it succeeded at the auction. WISPer ISP

---

[16] Doc. 252.

**6**

submitted a bid by the initial bid deadline but did not participate in the auction.[17] As announced at the March 6 hearing, WISPer ISP is a different entity from WISPer Ventures Leasing LLC, the plaintiff in an Arizona state court lawsuit that was removed to this Court.[18] Nevertheless, the Committee wants a successful bidder identified, the sale closed, and to reserve any rights it might have concerning collusion under § 363(n). I received the Members' Bid on March 9. That bid is different from what was articulated on March 6: the Member Group now offers an additional $500,000 as necessary to fund "all assignment, administrative, and assumption expenses" but doesn't mention funding the acquisition of the Kansas City and Joplin markets if JMZ fails to close.[19] The debtor filed a "Statement" on March 9 reminding the Court that the Committee does not support the rejection of the auction bids and that any disputes between the debtor and Committee are to be resolved by me.[20]

Analysis

***The Members' Bid Violates the Bid Procedures.***

As discussed above, the Bid Procedures outlined the sole means of qualifying to bid and participate in the auction. The procedures severely limited credit bidding. The Members' Group didn't qualify to be a bidder under the procedures, nor did it bid at the auction. Instead, the debtor asserts that the Seller (the debtor *and* the

---

[17] *See* Doc. 199.
[18] *WISPer Ventures Leasing, LLC v. Pixius Communications LLC, et al,* Adv. No. 19-5110 (Bankr. D. Kan.).
[19] Doc. 256.
[20] Doc. 258.

7

Case 19-11749    Doc# 263    Filed 03/10/20    Page 7 of 13

Committee) may reject the two auction bids and that the Member Group can credit bid as individual assignees of the CrossFirst secured debt. It is true that the "Seller" has the right to evaluate the bids and determine which is the "highest or otherwise best bid." It is also true that the "higher or best bid" need not necessarily be the most economically productive—various non-economic factors also apply, including whether the bid serves the interests of other stakeholders. And, the procedures also say that the Seller may reject a bid at any time without liability if it deems the bid be insufficient or inadequate or fails to meet other standards set out in ¶4(a), including lack of stakeholder support. But nothing in the procedures suggests that the debtor may *unilaterally* reject a bid—that is within the province of the "Seller," which is both the debtor *and* the Committee. The Committee opposes the Members' Bid and urges the court to approve either the LTD or JMZ bid instead. Even the Member Group's attorney urged a prompt sale decision on either the LTD or JMZ bid should the Court reject the Member Group's bid. The Bid Procedures also provide for this Court to resolve "[a]ny dispute regarding any of the matters set forth in this paragraph [¶4(a)] . . . ".[21] The Bid Procedures expressly empower the Court to resolve other disputes in the procedures or sale process.[22]

The Members' Group did not qualify as bidders, nor did they attempt to credit bid their interests at the auction. Indeed, the Bid Procedures explicitly restricted credit bids by secured parties with security interests in equipment. The

---

[21] Bid. Proc., p. 11, ¶4(a).
[22] Bid. Proc., p. 6 (any disputes as to [Bid Procedures]) and p. 10, ¶3(b) (disputes relating to the conduct of the auction).

8

Members' Group are assignees of debt that is secured by "all assets" of the debtor. Accordingly, they were precluded from credit bidding by the Bid Procedures order. Moreover, the auction closed before they bid at all, meaning that the other bidders were denied an opportunity to respond to the Members' Group bid. Even if they were permitted to make a credit bid under § 363(k), that bid should have been made at the sale. In these circumstances, I decline to displace the Bid Procedures to allow them to veto either of the timely bids.[23] The principles set out in ¶ 4(a) of the Bid Procedures require the Seller to reject the Members' Bid because it is "not a Bid otherwise in conformity with the requirements of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, or procedures set forth therein or herein."[24] The Members' Bid violates the Bid Procedures and should not be considered.

### *The Court Denies the Debtor's Rejection of the LTD and JMZ Bids.*

With the filing of Debtor's Statement[25] that a dispute exists between the Debtor and the Committee regarding rejection of the LTD and JMZ bids, it falls to the Court to determine whether those bids should be rejected. To do so at this stage of the proceedings would effectively leave no bid on the table and would necessitate starting the sale process over. It would potentially open the door to having new bidders qualify, including the Member Group, having the benefit of the prior bids of

---

[23] Previously in this sale process the debtor has asked me to permit a non-qualifying bidder to participate based on that bidder's intention to bid far more than either LTD or JMZ. *See* Doc. 199 (Motion to Allow Additional Bid filed January 17, 2020). Relying on these procedures, I denied that request and consider that consistency requires me to do likewise here. *See* Doc. 213.
[24] Doc. 150, p. 11.
[25] Doc. 258.

**9**

LTD and JMZ, and further delay a sale closing. Even worse, a "do-over" may stifle bids and run the risk of achieving a less desirable result or result in LTD and JMZ walking away from the sale. The Court rejects such an approach. The Bid Procedures did not provide for a stalking horse bidder nor set a minimum bid for the assets of debtor. The estate is administratively insolvent and by all accounts, the general unsecured creditors are out of the money. The bids are not inadequate, and pulling the rug out from these qualified bidders under these circumstances might chill a "new" sale; there is no assurance that a substantially larger bid will result. The Court therefore concludes that the LTD and JMZ bids should be accepted, and the debtor's rejection of those bids denied. These proceedings should move forward to determine which of the two bids is the high or best bid, and for approval of the sale to that bidder, reserving any rights parties may have under § 363(n).

### *LTD's Is the Highest and Best Bid.*

Based upon my review and comparison of bids provided by debtor's Further Submissions,[26] I find that LTD's is the bid that yields the most net cash to the estate based on the following calculations.

LTD offers $4,100,000 from which the cost of curing, assuming and assigning 17 leases, some property tax, and equipment financiers' secured claims will be deducted, leaving $3,669,716 through March 31, 2020. By comparison, JMZ offers $4,075,000, $25,000 less than LTD, but requires the curing, assumption, and

---

[26] Doc. 252.

**10**

assignment of *all* eighty-one (81) tower and ground leases, ATC's equipment leases, payment of property tax, and payment of equipment secured claims, leaving net proceeds of $2,861,826 through March 31, 2020.

The Further Submission posits that post-petition administrative rents payable to the lessors of rejected leases should be deducted from these net amounts and paid from the sale proceeds. But as Mr. Maxwell, another member and assignee of CrossFirst Bank noted, there is no legal basis to deduct these administrative expenses from secured creditors' proceeds. They may constitute priority claims as administrative rent payable under § 503(b) that would be accorded priority under § 507(a)(2), but they are still unsecured claims. It is important to distinguish between amounts necessary to cure and assume the leases to be transferred and administrative rents owing to rejected lessors, which are debts that may have priority. The former are permissible surcharges against the secured creditors under § 506(c) while the latter are unsecured claims not entitled to payment from the proceeds of secured property. Likewise, potential rejection damage claims associated with rejected leases are unsecured claims that are not entitled to payment ahead of secured claims and should not be deducted from the net proceeds.

Debtor's management favors JMZ's lower bid because of JMZ's stated intention to retain the debtor's employees'. The bidders' intentions with respect to debtor's employees, was a requirement of the Bid Procedures: "All Bids must include . . . (viii) . . . the extent to which the Bidder intends to assume obligations

related to employees of the Debtor."[27] The form Asset Purchase Agreement submitted by LTD, JMZ, and the Members' Group expressly provides that the purchaser may contact any of the debtor's employees to discuss "potential employment" post-closing, but "[p]urchaser shall have no obligation to offer employment to any employee of Seller following the Closing."[28] Moreover, the APAs contain an identical "retention plan" provision as part of the <u>Seller's</u> covenants: "Seller will assist Purchaser in developing a retention plan pursuant to which Purchaser may, at is sole discretion, retain certain employees of Seller."[29] LTD argues that it may well retain some, but not all, of the debtor's employees, but it declines to be obligated to do so.[30] As this is an asset sale, any bidder's verbal commitment to retain employees is likely not enforceable once the sale is closed[31] and cannot be afforded much weight in determining which of these bids is "highest or best."[32]

Finally, both LTD and JMZ rejected the "Cox" executory contract.[33] JMZ indicated its intent to negotiate post-closing a new agreement with Cox.[34] Nothing,

---

[27] Bid Proc., pp. 8-9, ¶ 2(b)(viii).
[28] See, e.g., doc. 252-1, p. 11, ¶ 2.5 (LTD's APA), doc. 252-2, p. 5, ¶ 2.5 (JMZ's APA), and doc. 256, p. 8, ¶ 2.5 (Members' Group APA).
[29] Doc. 252-1, p. 13, ¶ 5.3 and Doc. 252-2, p. 8, ¶ 5.3.
[30] Its bid summary indicated LTD's intent to retain the current employees for a 30-day transition period. Doc. 252-1, p. 3.
[31] Both APAs contain an integration clause, rendering any oral agreement between JMZ and Seller that JMZ would retain all the employees unenforceable. *See* Doc. 252-1, p. 16, ¶7.10 and Doc. 252-2, p. 11, ¶ 7.10. Nowhere in the e-mail thread between JMZ and Debtor regarding the APA and JMZ bid is the retention of employees mentioned. *See* Doc. 252-2, pp. 20-33.
[32] Notably, the Members' Bid also includes a similar verbal "guarantee."
[33] Doc 252-4, Ex. 1-C, note 3, and Ex. 2-C, note 3.
[34] Doc. 252-2, p. 20, ¶ 6.

of course, precludes LTD from doing the same. The services provided under the Cox contract have been described as "critical to the operation of the debtor's business."[35] One other major difference between LTD's and JMZ's bid, is that JMZ assumed the ATC equipment leases, while LTD rejected them, resulting in an additional cure amount of $170,064 to be paid from the JMZ proceeds.[36]

LTD's bid provides the highest amount of consideration considering the relationships it agrees to assume resulting in the highest net benefit to the estate.

Conclusion

The Members' Bid cannot be considered without disregarding the Bid Procedures, which are part of a final order of this Court. LTD's bid yields the most net cash to the estate before application to the secured creditors' claims, and is therefore declared the Higher and Best Bid. Time remains of the essence in this case. Voiding the present auction or directing that it resume is unfair to the bidders who complied with the procedures and risks further deterioration of the company and its assets.[37]

The debtor shall notice said bid for approval at an evidentiary hearing on March 16, 2020 at 9:00 a.m.

###

---

[35] *See* Doc. 236 – CoxCom LLC's emergency motion to compel assumption or rejection of executory contract, for payment of an administrative expense claim, and for relief from the automatic stay to terminate services.
[36] Doc 252-4, Ex. 2-B; *Cf.* Ex. 1-C and Ex. 2-C.

**13**